MEMORANDUM OF DECISION RE PETITION FOR REVOCATION OF COMMITMENT
On October 18, 1996, Annette F., mother of Brianna, filed a petition to revoke Brianna's commitment to the Department of Children and Families, hereafter "DCF." Brianna was born on December 28, 1993 and was removed from her mother's care on March 4, 1994, following the death of her twin sister from child abuse by a young male residing in the home with Annette. Annette's older two children, James and Caitlin, were also removed and placed into foster care on that date. Co-terminous petitions for neglect and termination of parental rights were filed by DCF. After trial, on March 8, 1995, the court adjudicated Brianna a neglected and abused child and found that grounds for termination of parental rights had been proven by clear and convincing evidence. On November 22, 1995, the court entered its decision on the dispositional phase of the proceedings and held that termination was not in Brianna's best interests and dismissed the petition. The court did order that Brianna be committed to the custody of DCF and Brianna F. remains a committed child. Subsequently, DCF filed a second termination petition on April 1, 1996, which remains pending at this time.[2]
It is in this second termination petition that the petition to revoke the commitment was filed on October 18, 1996. The court heard four days of testimony concerning the mother's petition and the trial concluded on November 17, 1998. The legal issue in this revocation hearing is whether or not a cause for the "commitment" of the child still exists. In re Juvenile Appeal (85-BC),195 Conn. 344, 488 A.2d 790 (1985). As was stated Inre Thomas L., 4 Conn. App. 56, 57, 492 A.2d 229 (1985):
 "The burden is clearly upon the persons applying for the revocation of commitment to allege and prove that cause for commitment no longer exists. Once that has been CT Page 15643 established, the inquiry becomes whether a continuation of the commitment will nevertheless serve the child's best interests. On this point, when it is the natural parents who have moved to revoke commitment, the state must prove that it would not be in the best interests of the child to be returned to his or her natural parents." (Internal citations omitted).
The court concludes, by a fair preponderance of the evidence reviewed below, that there remains cause for the commitment of Brianna as of November 17, 1998.
The next inquiry, then, is what is in Brianna's best interest. Because the court concludes that there remains cause for the commitment, the burden does not shift to the state to show that it would be detrimental for Brianna to be returned to her mother. Nonetheless, the evidence has shown that such a change in placement would be detrimental to this child. The court concludes, from the testimony, that it would be detrimental for Brianna to be returned to her mother and that it is not in her best interests that she be returned.
 1. CAUSE FOR CONTINUED COMMITMENT
At the time of Brianna's removal from her home, the cause of commitment can be summarized by the allegations of the neglect petition, which were that Brianna was a neglected and abused child. As the DCF social worker Aleta Markham testified, DCF at that time was concerned about Annette's ability to meet her children's physical and emotional needs. In the opinion of DCF, Annette did not have this capacity, as she had exposed her children to unsafe people[3] and that she did not provide the appropriate emotional care. While those concerns are expressed in the pleadings in terms of concrete and specific failures of Annette to protect her children, fundamentally they concern themselves with Annette's ability to have empathy for her children, to understand them and to put their needs ahead of hers.
Annette does not so much deny that this was so, but claims that since that time, she has met all DCF and court expectations and had rehabilitated herself as a parent. In May 1997, her two oldest children were returned to her care under protective supervision which has now ended. James, the oldest, is twelve years old and Caitlin is eight. Further, Annette argues if she is CT Page 15644 a fit parent for these two special-needs children, she is capable also of providing for their half-sibling, Brianna, who should be returned to her care.
At the conclusion of the respondent mother's evidence, the petitioner and counsel for the child moved to dismiss the petition for revocation, claiming that Annette had not made out aprima facie case for revocation. The court took the motion under advisement at that time and now denies these motions. If the court were to credit all of the respondent mother's witnesses and their testimony, the court could conclude that there no longer was a "cause" for commitment. As a result, the respondent mother has made the necessary evidentiary showing for a prima facie case for revocation of the commitment of Brianna to DCF.
This finding, however, as previously stated, does not require the court to overlook the testimony of the state's witnesses and other evidence before it. Turning first to the claims concerning the return of James and Caitlin to their mother, Ms. Markham, the DCF social worker, testified that they were older when removed from Annette's care, James was then six and Caitlin five years old. The children had a strong connection to their mother and enjoyed visiting with her. Further, James and Caitlin were placed, after a short stay in foster care, with their paternal grandparents, whom they had each known since their birth. They continued to have visitation with their mother and maintained a good connection with her. When their grandmother suffered a hip injury, she felt she could no longer provide care for them physically. So DCF, stated Ms. Markham, "made the best of a bad situation" and returned James and Caitlin to their mother as she had made some progress towards the goals set by DCF. Ms. Markham stated that there was no other satisfactory permanency plan for them because of their connection to their mother. Even though DCF still had concerns about Annette's parenting abilities, the connection she had with her two older children was viable and placement with their mother the best option for them.
Brianna, on the other hand, was only nine weeks old when she was removed from her mother's care. She was too young to have much of a connection and much of the time spent in the household had been chaotic. Brianna was not placed with the paternal grandparents of James and Caitlin, as she was not related to them. Brianna remained in foster care and while she enjoys a reasonable relationship with her mother, has never been as CT Page 15645 closely bonded to Annette.
Much of the testimony presented by Annette in support of the revocation petition concerned her claims of rehabilitation and the therapy she received since the removal of Brianna from her care. For two years, from 1995 to 1997, she met regularly with Susan Barth, who testified that Annette was appropriately engaged in treatment and made progress meeting the various treatment goals established. In particular, she believed that Annette had accepted responsibility for the role she played in the death of Brianna's twin sister. She stated that in her opinion Annette "is a competent, loving mother who would care well for all of her children." Nonetheless, this therapist did believe that Annette required ongoing treatment, which Annette has not sought out and received since 1997.
The DCF social workers testified that Annette had not made such progress. They referenced certain events which supported their conclusions. And in particular, the current worker, Linda Nasser, did not feel that Annette currently understood and was responsive to Brianna's emotional needs. Annette has had regular visitation with Brianna which in recent months included James and Caitlin as well. Ms. Nasser stated that Brianna's behavior with her siblings is more tentative than it is when she is at her foster home. At times, Annette would say things to her that were harsh and inappropriate. On one occasion, Ms. Nasser stated Annette said Brianna was "bossy and greedy" to Brianna during a visit. On another occasion, she told her that the foster parents were teaching her to be a liar. When Brianna described what happened on her birthday at the foster home, Annette made derogatory comments "is that all they did?" The child looked crestfallen after that. Another time, Annette told the children they were being bad. Brianna, who was sitting on her mother's lap stated "I'm not being bad". Annette's reply was that "you are controlling," after which Brianna again looked crestfallen. On another occasion, she stated that Brianna did not have good relationships with males.
In addition to the verbal statements exhibiting a considerable lack of sensitivity to Brianna, Ms. Nasser stated, that there is a lot of rough housing, playing tag and chasing during the visits. Brianna would take safety in Annette's lap often. The older children also played a game called the "Huggy Goblins" game which overwhelmed Brianna. When she played this game with her siblings, she was placed in a position of having to CT Page 15646 hug and kiss them when she was not prepared to do so.
Brianna has trouble going to the visits and is withdrawn and uncommunicative when she returns. Her foster mother described in detail the problems Brianna has in attending the visits. She refers in her foster home to Annette as "the Lady." During the school year, she often begins to ask when the visit is going to be several days before it will happen. When the day arrives, she does not want to get into the car, cries and struggles about it. The foster mother indicated that they have had a very difficult time with Brianna about the visits. Ms. Nasser also stated that the child did not want to visit, but that her foster mother has gone to very considerable lengths to make the process and transitions as smooth as possible.
Unfortunately for Annette, the DCF opinion about her rehabilitation as a parent is also supported by the court-appointed psychological evaluator, Dr. Robert Colen. Dr. Colen evaluated Annette, all three children, the foster parents, the grandparents and the father of James and Caitlin on multiple occasions. He testified that during his evaluation of Annette in 1996, she "tended to deny her culpability in the death of her child and tended to blame other people for her situation. She seemed to externalize the sources of her problems (and) lacked insight into how her own behavior resulted in these difficulties." He saw Annette again on 1998, and he still had the same clinical impression at that time. "Ms. F. still lacked insight into past actions and tended to externalize things. She viewed the world in a hostile fashion and she seemed overwhelmed by her own situation (with the return of the two older children). She has difficulty negotiating the demands of daily living." He concluded that her "pattern of instability was not unique to this situation, but was more characterological in nature." By the use of the term "characterological," he meant to refer to "enduring personality traits which are often manifested in the adolescent period." Such individuals, he stated, "have difficulty in conducting themselves in a more normal manner and have problems socially and occupationally and the person is often unable to rectify these early patterns." In his opinion, Annette's issues related to a characterological condition.
When questioned about how her characterological issues would impact Annette's ability to parent Brianna if she were returned to Annette's care, Dr. Colen stated:
CT Page 15647 "Some of the issues would impact on her ability to read the child's needs well, to be able to sensitively respond to those needs, to be able to create a supportive environment for her and to make good choices as to the people she exposed the children to. Also, to provide for the needs of the other two children will impact upon her ability to provide time for Brianna."
In Dr. Colen's 1998 evaluation of Brianna and Annette, he noted that "they show a fun, warm and close relationship in spite of their limited weekly contact with each other."[4] Nonetheless, Dr. Colen remained concerned about Annette's "continuing anger, feelings of victimization and lack of insight into how her situation has developed as it has." He testified that it was not in Brianna's interests for the present situation to continue and that enough time had elapsed and that the matter should be resolved.
Given the differing roles and educational levels of the mental health providers who testified before the court, the court finds the testimony of Dr. Colen to be more insightful and compelling. Ms. Barth saw herself as an advocate for Annette, did not have any outside information about Annette other than what had been supplied by Annette herself and did not believe additional information from other treatment providers or evaluators would be helpful. At the time of her treatment of Annette, she was still under supervision as a intern, having completed her masters degree in social work in 1995. Ms. Barth did not become a licensed clinical social worker until May 1997. Dr. Colen, on the other hand, has been a licensed clinical psychologist for over eighteen years and had performed over three hundred evaluations as well as treating adults and children on a regular basis. The court concludes from all the evidence that as of November 17, 1998, the last day of trial, Annette had not overcome at least one of the causes of the original commitment of the child; her ability to parent and be emotionally supportive and nurturing to Brianna. This failure was and is fundamental and far reaching and after many years has not been addressed by Annette.
On the last day of trial, James and Caitlin's grandmother testified. Her testimony outlined in stark detail the issue that DCF has stated again and again; that Annette cannot place the needs of her children ahead of her own. When Annette testified on her own behalf in August of 1998, she stated that she was aware CT Page 15648 of Brianna's connection to her foster parents and that if Brianna were returned to her, the child would need contact with her foster parents. "It was unfair and unrealistic to think that she could be totally separated from them." Her actions since August regarding the relationship her two older children have with their grandmother belie this statement. Her two older children lived with their grandparents for three years prior to being returned home to Annette. They have had a good and close relationship with their grandparents and have had regular visitation by court order. On November 11, 1998, their grandmother testified in court that Annette unilaterally terminated visits in October and left a message on her answering machine to tell her that there would be no more visitation. While Annette is clearly aware of the statements and sentiments expected of her by others, her actions tell another story. She remains isolated, without a support system within the community and appears to lack the ability to make and keep friends. The court concludes from this evidence that Annette did not consider James's and Caitlin's best interests in terminating contact with their grandparents. Her decision cast significant doubt on what future actions she might take on behalf of Brianna, if this child was returned to her care.
The court heard considerable additional testimony concerning Annette's employment history and her housing situation. Whether or not the claimed failures in these areas provide additional causes for the continued commitment of Brianna, the court does not now decide except to note that much of the testimony is relevant to the issues to be presented when the petition for termination of parental rights is tried. Having concluded that a cause of the commitment for Brianna continues to exist, which was proven by the fair preponderance of the evidence, the court will not consider the ancillary issues further.
 2. REVOCATION WOULD BE DETRIMENTAL TO BRIANNA
The case law does not require the court to consider what is in the best interests of Brianna, once a cause for her continuing commitment to DCF has been shown. Nonetheless, the evidence from the DCF worker and Dr. Colen was clear that each viewed a return of Brianna to Annette as detrimental to the child. Their conclusions were based in part upon the close relationship between the foster parents and in particular the foster mother with Brianna, who has lived with her current foster parents since she was fifteen months old. Dr. Colen stated that the foster CT Page 15649 parents were her psychological parents. He was struck by the "extremely close and connected relationship between them." He noted that Brianna was secure and comfortable in their presence. In particular, he stated that the foster mother was sophisticated in her parenting techniques and sensitive to Brianna's situation when she visits with Annette. He stated that it was to their credit that Brianna is a "loving, responsive and engaging child." He concluded that in his professional opinion it was in Brianna's best interest to remain with her foster parents. He also believed that some of the behavior caused by the characterological issues Annette possesses "would be detrimental for Brianna."
For all of the foregoing reasons, the court denies the petition for revocation of Brianna's commitment to the Department of Children and Families.
Barbara M. Quinn, Judge Child Protection Session
[2] In In re Brianna F., 50 Conn. App. 805, ___ A.2d ___ (1998), the appellate court upheld the ruling by the court (Dyer, J.) on a joint motion that held there was no preclusive estoppel effect of the previous judgment on the present litigation.
[3] The details of Annette's parenting failures, which led to the death of one of the children, and the removal of the three others are cataloged in In re Brianna F., supra, and will not be further repeated here.
[4] Petitioner's Exhibit IA, Report of Dr. Colen dated January 30, 1998.